IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TOM BROWN,<br><br>                    Plaintiff,<br><br>        v.<br><br>PELICAN PRODUCTS, INC.,<br><br>                    Defendant. | Civil Action No.    19-530<br><br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Tom Brown ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in Pelican Products, Inc.'s ("Defendant") corporate policies to cause its website to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1.      In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[1]

---

[1]      *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf)    (last accessed May 6, 2019).

2.      Tom Brown is legally blind. He uses a screen reader to navigate the Internet.

3.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein). Specifically,

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.* at *6-7.[2]

4.      According to its website, Defendant Pelican Products, Inc. is "the global leader in the design and manufacture of high performance protective cases, temperature controlled packaging solutions, advanced portable lighting systems and rugged gear for professionals and outdoor enthusiasts alike."[3]

---

[2]      *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed May 6, 2019) (discussing screen readers and how they work).
[3]      Pelican Products Inc.'s "Story", *available at* https://www.pelican.com/us/en/about/our-story/ (last accessed April 26, 2019).

5.      Consumers may purchase Defendant's products online at

https://www.pelican.com/us/en/shop/ ("Website"), a website Defendant owns, operates, and

controls.[4]

6.      Defendant's Website allows consumers to research and purchase Defendant's

products from the comfort and convenience of their own homes, contact customer service,

review important notices like Defendant's Privacy Policy and Returns and Exchanges, and

more.[5]

7.      Defendant is responsible for the policies, practices, and procedures concerning the

Website's development and maintenance.

8.      Unfortunately, Defendant denies approximately 8.1 million[6] Americans who have

difficulty seeing access to its Website's goods, content, and services because the Website is

largely incompatible with the screen reader programs these Americans use to navigate an

increasingly ecommerce world.

9.      Plaintiff brings this civil rights action against Defendant to enforce Title III of the

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among

other things, that a public accommodation (1) not deny persons with disabilities the benefits of

its services, facilities, privileges and advantages; (2) provide such persons with benefits that are

---

[4]      Pelican      Products,      Inc.'s      Privacy      Policy      *available      at*
https://www.pelican.com/us/en/about/privacy-policy/ (last accessed April 26, 2019) ("We respect
your privacy, and we are committed to protecting it through compliance with this policy.")
[5]      Pelican Products, Inc. Homepage, *available at* www.pelican.com (last accessed April 26,
2019).
[6]      Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the
U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul.
25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-
134.html (last accessed May 6, 2019) ("About 8.1 million people had difficulty seeing, including
2.0 million who were blind or unable to see.").

equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—
including electronic services for use with a computer screen reading program—where necessary
to ensure effective communication with individuals with a visual disability, and to ensure that
such persons are not excluded, denied services, segregated or otherwise treated differently than
sighted individuals; and (4) utilize administrative methods, practices, and policies that provide
persons with disabilities equal access to online content.

10.     By failing to make its Website available in a manner compatible with computer
screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind
and visually-impaired individuals the benefits of its online goods, content, and services—all
benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma
among these Americans that Title III was meant to redress.

11.     Because Defendant's Website is not and has never been accessible, and because
upon information and belief Defendant do not have, and have never had, adequate corporate
policies that are reasonably calculated to cause its Website to become and remain accessible,
Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

a)  Defendant retains a qualified consultant acceptable to Plaintiff ("Web
    Accessibility Consultant") who shall assist it in improving the accessibility of its
    Website, including all third-party content and plug-ins, so the goods and services
    on the Website may be equally accessed and enjoyed by individuals with vision
    related disabilities;

b)  Defendant works with the Web Accessibility Consultant to ensure that all
    employees involved in website and content development be given web
    accessibility training on a biennial basis, including onsite training to create
    accessible content at the design and development stages;

c)  Defendant works with the Web Accessibility Consultant to perform an automated
    accessibility audit on a periodic basis to evaluate whether Defendant's Website
    may be equally accessed and enjoyed by individuals with vision related
    disabilities on an ongoing basis;

d)  Defendant works with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e)  Defendant incorporates all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)  Defendant works with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Website, along with an e-mail address, live instant messenger, and toll-free phone number to report accessibility-related problems;

g)  Defendant directly links from the footer on each page of the Website, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website;

h)  Defendant accompanies the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)  Defendant provides a notice, prominently and directly linked from the footer on each page of its Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Defendant provides a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website;

k)  Defendant trains no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)   Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology;

m)   Plaintiff, his counsel, and their experts monitor the Website for up to two years after the Mutually Agreed Upon Consultant validates the Website is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

12.   Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

13.   Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

6

14.     As described in additional detail below, Plaintiff was injured when he attempted to access Defendant's Website from his home but encountered barriers that denied him full and equal access to Defendant's online goods, content, and services.

## PARTIES

15.     Plaintiff Tom Brown is and, at all times relevant hereto, has been a resident of Westmoreland County, Pennsylvania. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

16.     Defendant Pelican Products, Inc. is a California domestic for-profit corporation with its principle place of business at 23215 Early Avenue, Torrance, California 90505.

## FACTS APPLICABLE TO ALL CLAIMS

17.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

### DEFENDANT'S ONLINE CONTENT

18.     Defendant's Website allow consumers research and purchase Defendant's products from the comfort and convenience of their own homes.

19.     The Website also enables consumers to contact customer service, join the email list, and review important legal notices like Defendant's Privacy Policy.

20.     Consumers may use the Website to connect with Defendant's on social media, using sites like Facebook, Twitter, and Instagram.

**HARM TO PLAINTIFF**

21.     Plaintiff Tom Brown attempted to access the Website from his home in Westmoreland County, Pennsylvania.

22.     Unfortunately, because of Defendant's failure to build its Website in a matter that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services they wish to access on the Website. For example:

        a.     Defendant's Website fails to provide alternative text.



        b.     Additionally, the popup modal is not accessible.  When the popup becomes available, it is not given focus; a keyboard-only user must navigate through all content before the popup content becomes the next focusable element.

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints:



23.     These barriers, and others, deny Plaintiff full and equal access to all of the

services the Website offers, and now deter him from attempting to use the Website. Still,

Plaintiff would like to, and intends to, attempt to access the Website in the future to research the

products and services the Website offers, or to test the Website for compliance with the ADA.

24.     If the Website was accessible, *i.e.* if Defendant removed the access barriers

described above, Plaintiff could independently research and purchase Defendant's products.

25.     Though Defendant may have centralized policies regarding the maintenance and

operation of its Website, Defendant has never had a plan or policy that is reasonably calculated

to make its Website fully accessible to, and independently usable by, individuals with vision

related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

26.     The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

27.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

### DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

28.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

29.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

### THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

30.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

31.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

32.     Plaintiff asserts violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

33.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATIONS

### COUNT I

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

34.     The assertions contained in the previous paragraphs are incorporated by reference.

35.     Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

36.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Website, it has violated the ADA.

37.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

38.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

39.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

40.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

41.     By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

        (a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

        (b)     affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

(c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)    failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

42.    Defendant has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

43.    Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

44.    Making its online goods, content, and services compatible with screen reader programs does not change the content of Defendant's Website or result in making the Website different, but rather enables individuals with visual disabilities to access the Website Defendant already provides.

45.    Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

46.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

47.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff are described more fully in paragraph 11 above.

(C)     A permanent injunction enjoining Defendant from continuing its retaliatory and coercive conduct;

(D)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(E)     Payment of costs of suit;

(F)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(G)    The provision of whatever other relief the Court deems just, equitable and appropriate; and

(H)    An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: May 7, 2019                     Respectfully Submitted,

/s/ Benjamin J. Sweet
Benjamin J. Sweet
ben@sweetlawpc.com
**THE SWEET LAW FIRM, P.C.**
186 Mohawk Drive
Pittsburgh, Pennsylvania 15228
Phone: (412) 742-0631

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE STIRLING HALE & MILLER, LLP**
33 West Mission St. #201
Santa Barbara, California 93101
Phone: (805) 963-2345

*Counsel for Plaintiff, Tom Brown*

15